IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | |
| :--- | :--- |
| v. | CRIMINAL ACTION |
| JOHN D. GLENN, JR., | NO. 15-99-1 |
| Defendant. | |

## OPINION

**Slomsky, J.**                                                                    **August 24, 2018**

### I.  INTRODUCTION

On February 23, 2017, following an eight-day trial, a jury convicted Defendant John D. Glenn, Jr. of one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 (Count I) and bank fraud in violation of 18 U.S.C. §§ 1344 and 2 (Counts II and III).  (Doc. No. 141.)  The charges stemmed from a scheme to defraud three mortgage lending businesses in 2010 in which Defendant Glenn played a central role.

Before the Court is Glenn's Motion to Reconsider a Motion to Dismiss the Indictment.[1] (Doc. No. 217.)  He argues that the Indictment should be dismissed because the Government

---

[1]  On February 13, 2017, the first day of the trial, Glenn orally argued a Motion to Dismiss the Indictment due to pre-indictment delay, which was denied.  (Doc. No. 155 at 35:15-66:12.) On July 9, 2018, Glenn filed the instant Motion for Reconsideration of the Motion to Dismiss the Indictment.  (Doc. No. 217.)  The motion for reconsideration is a more extensive version of the oral motion.

A motion for reconsideration may be filed in a criminal case.  United States v. Fiorelli, 337 F.3d 282, 286 (3d Cir. 2003) (citations omitted).  "The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence."  Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 251 (3d Cir. 2010) (quoting Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)).  Thus, a proper motion for reconsideration "must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or

intentionally delayed indicting him in order to gain a tactical advantage over him and caused him to be prejudiced.  (Id. at 2.)   The acts giving rise to the charges occurred from in or about June 2010 to September 2010.  (Doc. No. 1.)  The Indictment was returned on March 12, 2015.  Glenn contends that he could have been indicted on a much earlier date.  The Government responds that Glenn has failed to show that the delay was caused intentionally by the Government and that he suffered actual prejudice.  (Doc. No. 219.)

Also before the Court are two other Motions filed by Glenn, which he titles a Motion for an Evidentiary Hearing (Doc. Nos. 218, 221) and a Cross-Motion for In Camera Inspection of FBI Rough Notes (Doc. No. 226).  He moves for an evidentiary hearing because he alleges that the Government violated their disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963).  He alleges that the Government provided him after the trial with the testimony of Postal Inspector Carol Balke and that this testimony would have exonerated him.  As to the "rough notes," Glenn claims that these notes "of interviews with witnesses 'may' contain favorable evidence related to his defense on the merit of his case."  (Doc. No. 226 at 1.)  For reasons that follow, the Motions (Doc. No. 217, 218, 221, 226) will be denied.

## II.     BACKGROUND

On March 12, 2015, Defendant John Glenn was charged in an Indictment with one count of conspiracy to commit bank fraud and two counts of bank fraud.  (Doc. No. 1.)  The Indictment concerned, among other things, a property known as "the Waverly Property" and involved a

---

(3) the need to correct clear error of law or prevent manifest injustice."  Wiest v. Lynch, 710 F.3d 121, 128 (3d Cir. 2013) (quoting Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010)).

Glenn's instant Motion does not contain any information that would warrant reconsideration under this three-part standard.  He has not demonstrated an intervening change in controlling law, availability of new evidence, or an error of law or manifest injustice.  Despite this failing, the Court will consider the Motion in this Opinion.

scheme to defraud and to induce mortgage lenders to make a loan for this property through misrepresentations and other fraudulent conduct. On February 23, 2017, a jury convicted Glenn on all counts. (Doc. No. 141.)

On July 9, 2018, Glenn filed the instant Motion to Reconsider the Motion to Dismiss the Indictment.[2] (Doc. No. 217.) He argues that the Court should dismiss the Indictment pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution because the Government intentionally delayed indicting him for five years, resulting in the "deprivation of key defense witnesses and otherwise interfering with his ability to defend himself at trial." (Id. at 1.) In its Response, the Government contends that it was not required to obtain an indictment any earlier than the statute of limitations provided and that there was no deliberate tactical strategy in delaying Glenn's Indictment. (Doc. No. 219.)

Next, on July 16, 2018 and July 19, 2018, Glenn filed two near-identical Motions for an Evidentiary Hearing. (Doc. Nos. 218, 221.) The only differences between the two Motions are (1) Document Number 221 includes a handwritten reference to exhibits on the first page; (2) Document Number 221 is formatted slightly different than Document Number 218; (3) Document Number 221 contains an email exchange between Susan Lin, Esquire, Glenn's standby counsel, and Joel Goldstein, Esquire, the Assistant United States Attorney prosecuting Glenn's case. The emails concern grand jury testimony, a letter from Lin to Glenn regarding Inspector Balke's grand jury testimony, and an undated, handwritten letter addressed to an individual named Nancy, which appears to be unrelated to this case; and (4) Document Number 221 contains an attachment entitled "Motion," which consists of a partial transcript with

---

[2] On July 19, 2018, Glenn filed an exhibit to accompany this Motion. (Doc. No. 220.) It is a five-count Information filed on October 10, 2013 against Otis Johnson, a co-conspirator of Glenn who testified against him at trial. Johnson owned a real estate title company that handled settlements on the loans.

statements made by Postal Inspector Carol Balke evidently before the grand jury, the FBI's

Memorandum of Interview with Otis Johnson, Otis Johnson's proffer dated October 11, 2012, a

copy of a HUD-1 Settlement Statement, and the Government's witness list for Glenn's trial.[3]

(Doc. No. 221-1.)    Inspector Balke's testimony is the primary basis for Glenn's Motions for

an Evidentiary Hearing.  Below is the portion of the grand jury transcript containing Inspector

Balke's answers upon which Glenn relies:

> Q:    Was Otis Johnson again asked to initially hold the funds in escrow?
>
> A:    Yes.
>
> Q:    On August 30th, 2010 did Johnson issue a check in the amount of $80,000 to Mr. Shaheed's company International Construction Specialist?[4]
>
> A:    Yes.
>
> Q:    And was there an acronym used for that?
>
> A:     ICSI.
>
> Q:    Was there a note on the bottom of the check that stated Glenn?
>
> A:    Yes.

---

[3]   During a June 26, 2018 status conference, the Court afforded Glenn the opportunity to supplement his post-trial Motions so that he could assert the issue of pre-indictment delay and renew his request for the "rough notes" of the agents assigned to his case.  The Government had briefed the issue of the production of rough notes and the claim of pre-indictment delay but did not respond to Glenn's Motions for an Evidentiary Hearing.  (Doc. No. 219.)  On August 15, 2018, Glenn filed a letter requesting the Court to compel the Government to respond.  (Doc. No. 227.)  On August 22, 2018, the Government did respond to the Motion.  (Doc. No. 229.)

[4]   Hassan Shaheed is Glenn's friend from childhood who owns a business banking account for his company, International Construction Specialists, Inc.  (Doc. No. 159 at 45:1-8, 47:16-23, 49:17-50:3.)  During Glenn's trial, Shaheed testified that he permitted Glenn to deposit money into Shaheed's business banking account and wrote checks at Glenn's direction.  (Id. at 50:6-24.)  He also provided cash from the account to Glenn at Glenn's direction.  (Id. at 52:16-24.)  Viewing the evidence in the light most favorable to the Government as the verdict winner, this evidence is proof that Glenn used Shaheed's bank account to launder or cover illegal proceeds of the fraud, which were then made available to him by Shaheed.

| Q: | Did Otis Johnson tell you that he gave the $80,000 check to Mr. Shaheed's company at John Glenn's direction? |
|---|---|
| A: | Yes, he did. |
| Q: | Was that to give Glenn various cash payments as well as pay Glenn's other expenses? |
| A: | That's correct. |

(Def.'s Ex. C; Doc. No. 221-1 at 1.)[5]

Glenn requests an evidentiary hearing because he alleges that the Government withheld what he construes as exculpatory and impeaching material. He claims that only after his trial did he receive the grand jury testimony of Inspector Balke, in which she stated "that Glenn told Johnson to keep funds for National Capital in the escrow account." (Doc. No. 218 at 1.) Glenn argues that if the jury members had heard this evidence during his trial, they may have rendered a different verdict on the charge of conspiracy. (Id. at 2.) Glenn avers that without these statements, "he was seriously handicapped in his ability to effectively cross-examine Johnson at trial," who had testified that he and Glenn agreed to divert proceeds from National Capital. (Id.)

## III. ANALYSIS

### A. The Indictment Will Not Be Dismissed Because Glenn Has Not Shown that the Government Intentionally Delayed Indicting Him and that He Suffered Prejudice as a Result of Pre-Indictment Delay

Prosecutors are given wide discretion in their decision "whether or not to prosecute, and what charge to file or bring before a grand jury." Wayte v. United States, 470 U.S. 598, 607

---

[5] The grand jury testimony is a small excerpt of testimony. During the eight-day jury trial, the evidence presented by the Government showing that Glenn engaged in the schemes to defraud was extensive. Filed on the same day as this Opinion is the Opinion and Order denying his Motion for a Judgment of Acquittal and/or New Trial. In that Opinion, the considerable amount of evidence introduced at trial against Glenn that supports the jury's verdict is set forth.

(1985). The time they obtain an indictment from a grand jury, however, is limited. As such, "the applicable statute of limitations is the primary guarantee against bringing overly stale criminal charges." Marion, 404 U.S. at 322 (citation and alteration omitted).

Even so, the Due Process clause offers further recourse for defendants against "oppressive pre-indictment delay within the applicable limitations period." United States v. Sebetich, 776 F.2d 412, 430 (3d Cir. 1985) (citing Marion, 404 U.S. at 324). Dismissal of an indictment is warranted if a defendant can prove "both (1) that the delay between the crime and the federal indictment actually prejudiced his defense; and (2) that the government deliberately delayed bringing the indictment in order to obtain an improper tactical advantage or to harass him." United States v. Beckett, 208 F.3d 140, 150-51 (3d Cir. 2000) (citing United States v. Lovasco, 431 U.S. 783, 789-90 (1977)).

      1.      **Glenn Fails to Show That He was Actually Prejudiced
By the Pre-Indictment Delay**

Glenn has not presented facts to show actual prejudice resulting from the pre-Indictment delay. Therefore, dismissal of the Indictment is unwarranted.

As discussed supra, a defendant must first offer proof of actual prejudice to support a Due Process claim to dismiss an indictment due to pre-indictment delay. The mere assertion of prejudice, however, does not automatically validate such a claim, and "the due process inquiry must [also] consider the reasons for the delay as well as the prejudice to the accused." Lovasco, 431 U.S. at 790. Moreover, to support a claim of prejudice in a situation where certain witnesses passed away during the pre-indictment period, a defendant must show that "the deceased would have proffered testimony not merely cumulative of the evidence already at [defendant's] disposal." United States v. U.S. Gypsum Co., 550 F.2d 115, 119 (3d Cir. 1977).

Glenn argues that he was prejudiced by the pre-Indictment delay because it interfered with his ability to secure witnesses and effectively hindered his defense at trial. Glenn refers first to Thomas R. Cappie, whom he describes as "a real estate developer, builder, and key witness." (Doc. No. 217 at 4.) Cappie died on April 24, 2015. (Id.) Second, he refers to Carl E. Watts, Esquire, his attorney during the Waverly transaction, who died on November 11, 2014. (Id. at 8.) He claims that the delay prejudiced him because he could not call these witnesses to testify on his behalf.

### a) Thomas Cappie

With respect to Cappie, Glenn purports that Cappie "had ties with all relevant parties, properties, and organizations set forth within the Government's allegations" and that he "took the lead in structuring the Waverly property transaction." (Id. at 6-7.) He also alleges that Cappie learned that Otis Johnson "was misappropriating and diverting lender funds" and subsequently "had a falling out with Otis after the Waverly property transaction, [and] he made several attempts to obtain monies owed by Otis Johnson." (Id. at 7.) The Government responds that Glenn mischaracterizes the evidence seeking to portray Cappie as more of a central figure than he actually was during the Waverly transaction. It argues that Glenn not only provides conclusory speculations but also fails to present facts to support his theory that Cappie drove the transaction. (Doc. No. 219 at 8.)

According to the Indictment, Cappie, who is referred to by his initials, "was a builder and business associate of [Michael Meehan]," the owner of the Waverly Property. (Doc. No. 1 ¶¶ 1-2.) The Indictment further alleged that Cappie "referred the purchased of the Waverly property to his acquaintance, defendant JOHN D. GLENN, JR., in exchange for a finder's fee." (Id. ¶ 2.) Later, the Indictment states that Glenn had applied for a short-term loan with Oroton in Cappie's

name and forged Cappie's signature on the agreement of sale as part of Glenn's scheme to defraud Oroton to induce this mortgage lending business to provide him with a loan. (Id. at 5-6 ¶¶ 1-2.) Cappie also was present at the July 7, 2010 closing for the Oroton loan, which was abruptly stopped by the representative of Oroton. (Id. at 6 ¶ 4.)

In the instant Motion, Glenn provides several averments indicating Cappie had some knowledge of Johnson's fraudulent activities but does not demonstrate how his testimony would provide evidence helpful to his defense. If anything, he attempts to show that Cappie became aware of Johnson's transgressions, but this information is unrelated to Glenn's role in the conspiracy and the defrauding of mortgage lending companies.

During trial, the Government presented evidence showing that Glenn was the driving force behind the Waverly transaction, not Cappie, particularly with respect to the Oroton loan application. The Government proved that documents containing Cappie's forged signature were submitted by Glenn at closing. He also presented fraudulent settlement statements, with Johnson's complementary efforts, to Oroton and other mortgage lending companies. In particular, Glenn submitted to Oroton an application for the $1.6 million loan under Cappie's name to purchase the Waverly property even though Cappie had not gone forward with the sale from Michael Meehan. (Doc. No. 157 at 20:17-21:2.) The real agreement of sale between Cappie and Meehan was for $856,431 and had been abandoned. The agreement of sale presented to Oroton to justify the $1.6 million loan was between Cappie and Shannen Kurz on behalf of Glenn's company, ISBN, LLC, but Kurz testified that she never signed any documents on behalf of the company nor did she have any authority to bind the company in such a contract. (Doc. No. 157 at 19:12-20:2, 20:20-21:2. 99:22-100:2; Doc. No. 158 at 130:4-7; Gov't Ex. 5-4.)

In view of these facts, Glenn has not sufficiently shown that Cappie would have provided exculpatory evidence had he testified during Glenn's trial.  See United States v. Baxt, 74 F. Supp. 2d 425, 434 (D.N.J. 1999) (finding that defendant must show with specificity that the pre-indictment delay resulted in the loss of exculpatory evidence "that is not merely cumulative of evidence available from other sources" (citations omitted)).  Cappie was used by Glenn to further his scheme to defraud Oroton.  Glenn has not shown how Cappie's presence would have helped him.  Moreover, Glenn's statement that Cappie would have evidence to attack Johnson's credibility has not been provided with specificity.  In any event, Cappie's testimony would have been deemed cumulative in light of the arsenal of impeaching evidence on Johnson that Glenn already possessed.

### b)  Carl E. Watts, Esquire

Glenn claims that Watts, in his capacity as Glenn's attorney, advised him that the Waverly transaction was lawful.  (Doc. No. 217 at 8.)  Watts evidently reviewed the documents prior to the transaction.  In this regard, Glenn asserts as a defense:  "Glenn in good faith followed the advice of counsel in the transaction involving the Waverly Property."  (Id.)  Glenn contends that "the Government's undue delay[] has effectively barred Mr. Glenn from raising an advice of counsel defense at trial."  (Id.)

The Government responds that any statements Watts would have made during Glenn's trial with respect to the legality of the transactional documents is irrelevant to Glenn's fraudulent activities.  It reiterates that:

> Glenn was not charged with defrauding lenders because the transactions, on paper, were unlawful on their face, but because of the myriad of false statements he made, and fraudulent documentation he created and presented to the lenders when attempting to induce and inducing them [to] lend money.

(Doc. No. 219 at 9.)

Here, Glenn is attempting to absolve himself of bank fraud by alleging that he relied upon his attorney's statements that his actions were legal. The Government submits, however, that Watts' review of documents before any misrepresentations or forgeries or other fraudulent activity associated with the Waverly settlements is irrelevant. Watts likely reviewed an unexecuted agreement of sale and the settlement form. At the time he reviewed the documents, and without knowing that Glenn sought to fraudulently obtain loans, Watts may have advised his client that the paperwork appeared to be in order. But did Glenn ask Watts if it was legal to forge and falsify documents and make representations about financial transactions? Did Glenn inquire of his lawyer as to whether it was lawful to misappropriate funds and not use them for a proper purpose? Glenn has not proffered any evidence that he did so and his lawyer advised that such conduct was lawful. Thus, Glenn has not shown how Watts' testimony would have been exculpatory in view of the mountain of evidence of wrongdoing and false statements made by Glenn orally and in documents. In sum, he has not met his burden to show that he was prejudiced by not having Cappie and Watts available to testify at his trial.

### 2. Glenn Also Fails to Show that the Government Intentionally Delayed Indicting Him as a Tactical Maneuver or to Harass Him

The Indictment will not be dismissed for another reason. Glenn has failed to show that the Government intentionally delayed indicting him for the purposes of gaining a tactical advantage over him or to harass him, which is the second prong of the due process pre-indictment delay test.

As discussed above, a motion to dismiss an indictment for pre-indictment delay should be granted if a defendant can show that it caused him substantial prejudice to his right to a fair trial and "that the government deliberately delayed bringing the indictment in order to obtain an improper tactical advantage or to harass him." United States v. Beckett, 208 F.3d 140, 149 (3d

Cir. 2000) (citations omitted). A caveat, however, is that the prosecution of "a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." <u>Lovasco</u>, 431 U.S. at 797.

As a preliminary matter, the Indictment referred to crimes taking place from on or about June 2010 through at least September 2010. (Doc. No. 1.) It was returned on March 12, 2015. (<u>Id.</u>) Thus, the Grand Jury returned the Indictment well within the ten-year statute of limitations period under 18 U.S.C. § 3293, which secures the "primary guarantee against . . . overly stale criminal charges" as prescribed by <u>Marion</u>. Despite the fact that the Indictment was returned during the applicable limitations period, Glenn makes his Due Process claim predicated upon the notion the Government had sufficient facts at its disposal to indict him around the same time it indicted Johnson, in October 2013. He relies upon the content of the Information filed against Johnson, which contains references to Glenn by his initials and refers to Glenn as a co-conspirator. (Doc. No. 220 at 2-19.) Glenn points to the fact that he was being investigated during this period up to the return of his own Indictment, in March 2015. He argues:

> The government had everything to indict Mr. Glenn in 2013, at the same time it indicted Otis Johnson. The government could have indicted Mr. Glenn and Otis Johnson at the same time. But it did not. Instead it made a tactical decision to indict Mr. Johnson first. The government then waited until Cal [sic] Watts died. Then Tom Cappie died shortly after the indictment. Their delay was for merely tactical reasons, which is not a legitimate reasons [sic] under the Due Process Clause.

(Doc. No. 217 at 10.) Hence, he accuses the Government of "unreasonable delay," and he claims that it had no legitimate reason for the pre-Indictment delay. (<u>Id.</u> at 6.)

The Government responds that although it charged Johnson in an Information, which did contain several references to Glenn, it was not prepared to seek an Indictment against Glenn, "particularly in this complicated and document rich case." (Doc. No. 219 at 5.) It also notes that

its investigation of Johnson was ongoing, explaining that although the Information was filed on October 13, 2013, he was also indicted on another matter on June 26, 2014. (Id. at 7 n.1.) The investigation continued and the Government submits that its "relationship with a key cooperating witness against Glenn was not resolved until approximately four months before Glenn was indicted." (Id.)

These facts must be considered in relation to the applicable legal standard. First, the threshold inquiry into pre-Indictment delay is not whether it was unreasonable, but rather whether it was intentional. Second, even if the delay was intentional by the Government, the next step is to determine whether it was done to obtain a tactical advantage over a defendant or to harass him. See United States v. Sebetich, 776 F.2d 412, 430 (3d Cir. 1985) (affirming district court denial of appellants' motion to dismiss the indictment because appellants failed to establish that delay was caused by "government to give some tactical advantage over appelants.")

In United States v. Ladson, the Third Circuit held that a three-year pre-Indictment did not warrant an indictment to be dismissed even where the prosecutor was unable to offer a definite explanation for the delay. 238 F. App'x 874, 876 (3d Cir. 2007). The Court was unpersuaded by defendant's argument that the inaction of the government equated with an intentional strategy to gain a tactical advantage over him after finding no "nefarious purpose on the part of the government." Id. Similarly in United States v. Staton, the Third Circuit held that dismissal of an indictment was unwarranted where a defendant was unable to show that the delay was intentional and where the government continued to discover more of defendant's "many fraudulent schemes." 605 F. App'x 110, 113 (3d Cir. 2015). The Court reiterated that indicting "a defendant following investigative delay does not deprive him of due process." Id.

At the outset, "there is no requirement imposed by the Fifth Amendment which requires that a prosecutor seek an indictment the moment he has probable cause to believe that an accused is guilty." United States. v. Ismaili, 828 F.2d 153, 168 (3d Cir. 1987) (citing Lovasco, 431 U.S. at 791). Here, merely because the Government had probable cause to seek Glenn's Indictment does not mean that the pre-Indictment delay was a tactical strategy. Moreover, the Government had a legitimate reason for not indicting Glenn at the same time Johnson's Information was filed in 2013 because its investigation of Johnson was still ongoing. As such, it was still gathering facts on the scope of Johnson's criminal activities. Johnson was indicted in a second case and the Government had the right to delay Glenn's Indictment to determine if Johnson would cooperate against Glenn. Johnson was a central witness to prove Glenn's guilt in this case.

And, most importantly, there is no evidence that the Government deliberately delayed the return of the Indictment for the purpose of gaining a tactical advantage over Glenn or merely to harass him. Glenn's accusation that the Government deliberately waited for Cappie or Watts to die before indicting him is unsubstantiated and no adverse inference against the Government arises from the sequence of events regarding Johnson.

In short, because Glenn has failed to show both that the he suffered actual prejudice from the pre-Indictment delay and that the delay was intentionally caused by the Government to gain a tactical advantage over him or to harass him, his Motion to Reconsider the Motion to Dismiss the Indictment (Doc. No. 217) will be denied.

## B. Motions for Evidentiary Hearing and In Camera Review

Glenn also moves for "the court to conduct an evidentiary hearing to determine whether a new trial[6] should be issued based on a potential Brady violation." (Doc. No. 218 at 1.) Glenn alleges had the jury known about Inspector Balke's grand jury testimony wherein she indicated that Johnson gave Hassan Shaheed a check at Glenn's direction from funds that Glenn initially told Johnson to put into an escrow account, it would have acquitted him. He claims, somewhat inexplicably, that this evidence was exculpatory and impeaching evidence because it showed that he had told Johnson to place the funds of National Capital, one of the defrauded mortgage companies, in an escrow account, rather than to misappropriate them as the Indictment described. (Id.) Glenn requested and received the grand jury testimony of Inspector Balke after his trial.

In addition, he moves for an in camera inspection of the FBI agents' "rough notes." (Doc. No. 226.) Glenn believes generally that the rough notes contain exculpatory information and more particularly that "the agents['] investigative notes may contain the issuing [sic] testimony of Johnson stating that Glenn told him to keep the funds in the account." (Doc. No. 226 at 2.) The Government submits two points in response. First, the notes are not considered statements under Rule 26 of the Federal Rules of Criminal Procedure, which governs its disclosure obligations. Second, Glenn provides "an insufficient basis to require the production of the agents' rough notes under Rule 16 [of the Federal Rules of Criminal Procedure], the Jencks Act or any evidentiary basis." (Doc. No. 219 at 12.)

---

[6] On March 13, 2017, Glenn filed a Motion for Judgment of Acquittal or New Trial. (Doc. No. 151.) This Motion will be addressed in a separate Opinion.

### 1. Glenn Has Failed to Show that Inspector Balke's Statements Were Exculpatory or Impeaching

Glenn's reliance on an excerpt of Inspector Balke's testimony is insufficient to find a Brady violation because it is neither exculpatory nor is it non-cumulative impeaching evidence.

Pursuant to <u>Brady v. Maryland</u>, the Government is required to disclose evidence that is favorable to the accused and material to guilt or punishment, "irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). To show a <u>Brady</u> violation, a defendant must establish the following: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been withheld by the Government, willfully or inadvertently; and (3) the defendant suffered prejudice. <u>Dennis v. Sec'y, Pa. Dep't of Corr.</u>, 834 F.3d 263, 284-85 (3d Cir. 2016). Moreover, under <u>Giglio v. United States</u>, the Government must disclose any witness impeachment information if the reliability of the witness "may well be determinative of guilt or innocence." 405 U.S. 150, 154 (1972).

Glenn claim's that Inspector Balke's statements to the grand jury show that he had intended to keep settlement funds in escrow, and thus he "had no malicious intent of stealing money from National Capital. Had Glenn been given this material before trial, he could have been exonerated from the conspiracy." (Doc. No. 221 at 2.) This is an unfounded conclusion. Glenn has cited a small portion of the grand jury transcript to characterize it in his favor.

But the information gleaned from Inspector Balke's statements are not exculpatory because she does not state that Glenn intended the funds to be placed in escrow for proper purposes. In fact, the evidence about Glenn's intention to keep the money in escrow is not

exculpatory, but it is incriminating. Hassan Shaheed testified during the trial that Glenn used Shaheed's company's bank account to make his deposits and that Glenn would direct Shaheed to make checks made out to specific individuals and to Glenn for cash. (Doc. No. 159 at 45:1-8, 52:16-24.) The evidence shows that Glenn used Shaheed's account as a cover and to launder the proceeds.

Glenn simply has failed to demonstrate a "reasonable probability" that had the evidence of Inspector Balke's testimony been disclosed earlier, it would have resulted in an acquittal on the charge of conspiracy. Moreover, he was not prejudiced by not having the grand jury testimony before trial. Accordingly, Glenn's Motions for an Evidentiary Hearing (Doc. Nos. 218, 221) will be denied.

### 2. Glenn Has Failed to Show that He Is Entitled to the FBI Agents' Rough Notes

Lastly, Glenn moves for an in camera review of the "rough notes" of the FBI agents investigating his case pursuant to Federal Rule of Criminal Procedure 26.2. (Doc. No. 226.) He has not fulfilled, however, his burden to show that these notes qualify as statements under the Rule.

Rule 26.2, in pertinent part, states:

> (a)      Motion to Produce. After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government . . . to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Fed. Crim. P. 26.2(a). A statement is defined as:

> (1)      A written statement that the witness makes and signs, or otherwise adopts or approves;

(2)     A substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording; or

(3)     The witness's statement to a grand jury, however taken or recorded, or a transcription of such a statement.

Fed. Crim. P. 26.2(f)(1-3).  Consistent with Rule 26, the Jencks Act "requires that after each government witness has testified on direct examination, the government must produce to the defense 'any statement' made by the witness which relates to his or her testimony." United States v. Ramos, 27 F.3d 65, 68 (3d Cir. 1994).  In addition, in United States v. Vella, the Third Circuit held that "the rough interview notes of F.B.I. agents should be kept and produced so that the trial court can determine whether the notes should be made available to the appellant under the rule of Brady v. Maryland  . . . ."  562 F.2d 275, 276 (3d Cir. 1977).

Upon review of Rule 26, the FBI's "rough notes" are not statements as defined by the rule.  Glenn has not shown that these notes were either adopted or signed statements of witnesses interviewed, were contemporaneous recorded recitals of an oral statement, or were statements made to the grand jury.   The situation here is similar to the one in Ramos, where the Third Circuit found that destroyed rough notes did "not constitute 'statements' of the cooperating co-conspirators, for they are neither 'substantially verbatim recitals' of what those witnesses said during their proffers nor writing which they signed or otherwise adopted or approved."  27 F.3d at 69-70.

Moreover, his hope that the notes might contain evidence to impeach Johnson is insufficient to warrant production.  See Ramos, id. at 71 ("[T]he mere possibility that the destroyed notes might have included Brady material, without more, is insufficient to implicate such concerns.").  In addition, any notes about keeping money in Shaheed's escrow account would not be exculpatory for the reasons noted above.

Glenn is required to make a colorable claim that "the . . . rough notes contained evidence favorable to him and material to his claim of innocence or to the applicable punishment—and that such exculpatory evidence has not been included in any formal interview report provided to defendant . . . ." id. He fails to make such a colorable claim. Accordingly, his Motion for an in camera review of the FBI agents' rough notes (Doc. No. 226) will be denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendant John D. Glenn, Jr.'s Motion to Reconsider the Motion to Dismiss the Indictment (Doc. No. 217), Motions for Evidentiary Hearing (Doc. Nos. 218, 221), and Cross-Motion for In Camera Inspection of FBI Rough Notes (Doc. No. 226) will be denied.