IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

JOHN D. GLENN, JR.,

    Defendant.

CRIMINAL ACTION
NO. 15-99-1

## OPINION

**Slomsky, J.**                                                    **August 24, 2018**

## I.    INTRODUCTION

On February 23, 2017, following an eight-day trial, a jury convicted Defendant John D. Glenn, Jr. of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 (Count I) and bank fraud in violation of 18 U.S.C. § 1344 and 2 (Counts II and III).  Before the Court is Glenn's Motion for a Judgment of Acquittal or New Trial pursuant to Federal Rules of Criminal Procedure 29 and 33.  (Doc. No. 151.)

In his Motion, Glenn raises two issues.  First, he challenges the sufficiency of the evidence, arguing that the Government failed to present sufficient facts to prove that he entered into a conspiracy with another individual for the purpose of diverting and misappropriating loan proceeds as charged in Count I, and that he intended to defraud mortgage companies as charged in Counts II and III.  (Doc. No. 170.)  Second, Glenn alleges that he was not afforded the right to present a complete defense when the Court denied his request for a trial continuance.  (Id.)  The Government filed a sealed response to Glenn's Motion, arguing that it provided the jury with an abundance of evidence to convict Defendant of conspiracy to commit bank fraud and the two

substantive counts of bank fraud.  (Doc. No. 178.)  The Government also submits that the Court properly exercised its discretion to deny Glenn's request for a trial continuance.  Because the Court finds that (1) the evidence presented by the government is sufficient to establish Glenn's guilt beyond a reasonable doubt on all the charges contained in the Indictment, and (2) the interest of justice does not require a new trial, the Court will deny Glenn's Motion for Judgment of Acquittal or for a New Trial.

## II.   BACKGROUND

### A.  The Indictment and the Scheme to Defraud Three Mortgage Lending Businesses

On March 12, 2015, a grand jury returned a three-count Indictment against Glenn.  (Doc. No. 1.)  The Indictment charged him with one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 and two counts of bank fraud in violation of 18 U.S.C. § 1344. Count I states in part:

> From in or about June 2010 through at least September 2010, in the Eastern District of Pennsylvania, and elsewhere, defendant
>
> JOHN D. GLENN, JR.,
>
> knowingly and willfully conspired and agreed, together and with Otis M. Johnson[1] and others known and unknown to the Grand Jury, to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Oroton, Stout Street and National Capital, which are mortgage lending businesses, and to obtain monies owned by and under the care, custody and control of those mortgage lending businesses by means of materially false and fraudulent pretenses, representations and promises, in violation of 18 U.S.C. § 1344.

(Doc. No. 1 ¶ 11.)

The Indictment charged in Count II:

---

[1]   Otis Johnson was the proprietor of a real estate title company, Mabstract, LLC, and was charged in an Information with conspiracy to commit bank fraud and mail fraud, and with the substantive charges of mail fraud, bank fraud, and aiding and abetting.  Information, United States v. Johnson, Crim. A. No. 13-554 (E.D. Pa. Oct. 11, 2013).  Johnson pled guilty and testified at Glenn's trial as a Government witness.

In or about June 2010 through at least September 2010, in the Eastern District of Pennsylvania, defendant

JOHN D. GLENN, JR.,

together with Otis M. Johnson, and others known and unknown to the Grand Jury, knowingly executed, and aided and abetted the execution of, a scheme to defraud Stout Street, a mortgage lending business, to obtain monies owned by and under the care, custody and control of that financial institution by means of materially false and fraudulent pretenses, representations and promises.

(Id. at 11 ¶ 2.)  The Indictment charged in Count III:

In or about August 2010 through at least September 2010, in the Eastern District of Pennsylvania, defendant

JOHN D. GLENN, JR.,

together with Otis M. Johnson, and others known and unknown to the Grand Jury, knowingly executed, and aided and abetted the execution of, a scheme to defraud National Capital, a mortgage lending business, to obtain monies owned by and under the care, custody and control of that financial institution by means of materially false and fraudulent pretenses, representations and promises.

(Id. at 13 ¶ 2.)

**B.  Overview of the Scheme to Defraud Three Mortgage Lending Businesses**

In mid-2010, a residential property ("the Waverly property") located in Bryn Mawr, Pennsylvania was in foreclosure.  (Id. at 1 ¶ 1.)  Michael Meehan, who co-owned the property with his then-wife, Karen Meehan, sought to sell it by way of a short sale to avoid foreclosure.[2] (Id.)  Initially, they entered into an agreement of sale of the Waverly property for $856,431 with a Thomas Cappie.  (Doc. No. 157 at 17:17-20:2.)  Cappie, however, was unable to secure financing to complete the transaction.  (Id. at 20:17-21:2)  As a result, Cappie assigned his interest to defendant Glenn, who had agreed to purchase the Waverly property.  (Id. at 22; Doc. No. 1 at 1 ¶¶ 2-3.)

---

[2]  In real estate transactions, a short sale is when a holder of a lien on a property agrees to release the lien and accept a sale of the property in which the proceeds of the sale are less than the amount of the lien.

To secure funding for the purchase, Glenn applied for loans from the three mortgage lending businesses: Oroton Equities, Inc. ("Oroton"), Stout Street Funding, LLC ("Stout Street"), and National Capital Management, L.P. ("National Capital"). (Doc. No. 1 at ¶ 13.) To do so, he held himself out as the principal of two businesses, International Small Business Network, LLC ("ISBN") and SSJ Realty, LLC ("SSJ Realty"). He also claimed that he was a successful real estate investor to further induce the companies to make the loans. (Id. ¶ 3.)

### 1. Scheme to Defraud Oroton

In June 2010, Glenn applied for a loan of $1.6 million under Cappie's name with Oroton. (Id. at 5 ¶ 1.) Glenn told the Oroton loan officer that the purpose of the loan was to finance the purchase of the Waverly property from Meehan to Cappie, even though Cappie was no longer part of the Waverly transaction. (Id.) Glenn represented that his company, ISBN, would then purchase the property from Cappie for $1.85 million with funds it had received from another lender, Stout Street. (Id.) In reality, Stout Street had not agreed to such a transaction. He provided Oroton with another agreement of sale between Cappie as the seller and Shannen Kurz and ISBN as the buyers.[3] (Doc. No. 157 at 103:5-10.)

Oroton agreed to loan the $1.6 million contingent on the second sale of the Waverly property to ISBN. (Doc. No. 1 at 6 ¶ 3.) On July 7, 2010, the closing for the loan took place. (Id. ¶ 4.) Glenn, along with a representative of Oroton, Cappie, Michael Meehan, and Otis Johnson attended the closing. (Id.) Before the closing was complete and Oroton wired the funds, the Oroton loan officer discovered that the actual payoff amount of the existing mortgages

---

[3] Shannen Kurz testified that she did secretarial work for Glenn on a per assignment basis. (Doc. No. 158 at 125:18-29, 126:18.) She stated that she had limited contact with Glenn during summer 2010. (Id. at 127:24-128:5.) Kurz testified that she never had an official position with ISBN or had any authority to bind ISBN on any contract and that she never signed documents on behalf of ISBN. (Id. at 130:4-17.)

was only approximately half the amount of the Oroton loan about to be committed. (Id.) He also was unable to verify the Stout Street $1.85 million loan commitment. (Id.) Ultimately, Oroton declined to fund the loan. (Id. ¶ 5.)

### 2. Scheme to Defraud Stout Street

Meanwhile, also in June 2010, Glenn approached Stout Street for a $480,000 loan to finance the same Waverly property. (Id. at 7 ¶ 6.) Glenn sought the loan purportedly on behalf of ISBN and represented that Shannen Kurz, as the vice president of ISBN would be the named borrower. (Id. ¶ 8.) He provided Stout Street with an agreement of sale of the Waverly property for $800,000 showing Michael Meehan as the seller and Kurz, on behalf of ISBN as the buyer. (Doc. No. 158 at 19:10-25.) The document was notarized by Glenn. (Id. at 24:8-17.) Glenn also submitted ISBN's purported corporate resolution to show that Kurz had authority to bind the company in real estate transactions, as well as ISBN's articles of organization, IRS tax form, operating agreement, and certificate of formation to prove the company's legitimate LLC status. (Id. at 33:15-35:6.)

On July 19, 2010, Stout Street approved the loan of $480,000 to ISBN to finance the Waverly property and wired the funds to the escrow account, maintained by Johnson's company, Mabstract. (Doc. No. 1 at 7 ¶ 9.) This loan was secured by a first position mortgage on the property. (Id.) Any prior existing mortgages were to be satisfied at closing with the funds from Stout Street. (Id.) Johnson, the title agent, with the complicity of Glenn handled this settlement of the Waverly transaction and falsely represented on a HUD-1 settlement document[4] that Shannen Kurz, on behalf of ISBN, was the buyer and that Michael and Karen Meehan were the

---

[4] HUD refers to the United States Department of Housing and Urban Development. A HUD-1 is a standardized form used in real estate transactions to list all fees and costs charged to a borrower and seller in connection with obtaining a real estate loan and the distribution of the money.

sellers. (Id. ¶ 10, Doc. No. 158 at 35:11-35:3, 85:11-19.) The settlement document also falsely showed that Glenn provided $450,000 in earnest money towards the Waverly property purchase and that the sellers provided $53,548 to cover costs. (Doc. No. 1 ¶ 11.)

Stout Street understood that the $480,000 loan was to be used to purchase the Waverly property and would be distributed in strict accordance with the settlement document instructions. (Id. at 8 ¶ 13.) This was not done. Instead, Glenn and Johnson agreed to keep the funds in the Mabstract escrow account. (Id. ¶ 14.) At Glenn's direction, Johnson deposited $40,000 of the funds into the business bank account owned by Glenn's childhood friend, Hassan Shaheed.[5] (Id. ¶ 15.) Shaheed testified about the $40,000 deposit:

Q:     And do you see the entry for July 21st on the bottom?

A:     Yes, sir.

Q:     And can you identify that?

A:     Yeah, it says $40,000.

Q:     Do you know where that came from?

A:     Mabstract.

Q:     Do you know what Mabstract is?

A:     I guess it was a title company I guess. I'm not sure, but I think so.

Q:     Was that $40,000 money that belonged to you?

A:     No.

Q:     Who did that money belong to?

A:     From Mabstract I guess to John Glenn.

---

[5]     Hassan Shaheed is Glenn's friend from childhood who had a business banking account for his company, International Construction Specialists, Inc. (Doc. No. 159 at 45:1-8.) During Glenn's trial, Shaheed testified that he permitted Glenn to deposit money into Shaheed's business banking account and wrote checks at Glenn's direction. (Id. at 50:6-24.) He also provided cash from the account to Glenn at Glenn's direction. (Id. at 52:16-24.)

Q:      Okay.  Did John Glenn alert you that this money would be coming into the
        account before it did?

A:      Yes.

Q:      Did you agree to accept that wire transfer on behalf of Mr. Glenn?

A:      Yes.

Q:      Tell the members of the jury why you agreed to do that.

A:      John Glenn said he didn't have an account and he needed to go ahead and
        deposit that money into my account because - - based on construction
        ventures that we were going to do.

Q:      Did Glenn ask you to do anything with that money?

A:      Not at the time when it came in, no.

Q:      Did he ask you to write checks against the money that was in your
        account?

A:      Yes, I did.

Q:      And were there multiple checks that you wrote against your account for
        money that was John Glenn's?

A:      Yes, I did.

(Doc. No. 159 at 49:3-50:24.)

### 3.  Scheme to Defraud National Capital

Later, in August 2010, Glenn also sought a loan to purchase the Waverly property from

National Capital.  (Doc. No. 1 at 9 ¶ 16.)  This time, he held himself out as the principal of SSJ

Realty, LLC and applied for a loan in the amount of $550,000.  (Id.)  The loan was to be secured

by a first position mortgage on the Waverly property.  With his application, Glenn provided the

National Capital loan officer a personal financial statement listing his assets and liabilities (Doc.

No. 158 at 167:19-168:3, 170:10-24), an agreement of sale showing Michael Meehan as the

seller and SSJ Realty, LLC as the buyer (Id. at 171:7-25), and his own federal tax returns (Id. at

174:3-175:177:9).

7

National Capital also required that Glenn be represented by counsel and further required an opinion of counsel. (Id. at 179:16-180:10.) Glenn provided such a letter, which National Capital viewed as insufficient. (Id. at 180:4-14.) The loan officer spoke with Glenn's counsel who requested from the officer a boilerplate version of a standard opinion of counsel letter. (Id. at 180:15-181:1.) The loan officer provided the letter and Glenn's counsel subsequently sent back a completed version of the form. (Id. at 181:5-8.) The letter, dated August 26, 2010 and written by a William Staton, who was evidently employed by Carl Watts, Esquire, indicated that SSJ Realty was a valid LLC operating in good standing under the laws of Pennsylvania. (Id. at 181: 15-24; Gov't Ex. 7-8.)

On August 27, 2010, National Capital approved the loan and deposited a total of $550,000 in the Mabstract escrow account. (Doc. No. 1 at 9 ¶ 18.) At the closing, a false settlement document was created, showing Michael and Karen Meehan as the sellers and Glenn as the buyer with a sale price of the Waverly property for $855,000. (Doc. No. 158 at 186:4-16.) It also showed that Glenn provided $344,000 in the Mabstract escrow account as earnest money. (Doc. No. 1 at 9 ¶ 17.)

Again, Johnson did not distribute the escrow funds as per the settlement instructions and did not pay off the prior existing mortgages on the Waverly property. (Id. ¶ 19.) Rather, Glenn and Johnson agreed to misappropriate the funds lent by National Capital. (Id.) On or about August 30, 2010, Glenn directed Johnson to misappropriate $80,000 of National Capital's funds in the Mabstract escrow account and deposit the amount into Hassan Shaheed's business account. (Id. at 10 ¶ 20.) From Shaheed's account, Glenn then directed Shaheed to make deposits and payments to Glenn and other individuals. (Id. ¶ 21, Doc. No. 159 at 47:16-23, 49:20-50:3, 50:6-24.)

### C. Summary of the Evidence Presented at Trial

Glenn's trial took place from February 13, 2017 to February 23, 2017 before a jury. During trial, the Government presented extensive evidence to prove Glenn's scheme to defraud the three mortgage lending businesses and his conspiracy with Johnson to achieve the scheme. The Government called, among others, the following witnesses at Glenn's trial:

- Nicholas Bentivoglio, Chairman and Chief Executive Officer of Oroton

- Terrence Dewyse, a loan officer at Stout Street

- Richard Frankel, a principal and loan officer at National Capital

- Michael Meehan, the owner of the Waverly property

- Otis Johnson, the title agent Glenn used to further the scheme and co-conspirator

- Hassan Shaheed, an acquaintance of Glenn's

- Shannen Kurz, a clerical and administrative worker of Glenn's

- Joseph McCann of the United States Postal Inspection Service, case agent

- Carol Balke of the United States Postal Inspection Service, former case agent

- June Bilbrough of the Delaware Department of State Division of Corporations

- Julio Pena of the Pennsylvania Department of State Division of Notaries

- Chad Searer of the Pennsylvania Department of State Division of Corporations

#### 1. False Documents and Misrepresentations to Oroton

As discussed supra, Oroton's $1.6 million loan was contingent upon the execution of the sale between Cappie and Kurz, on behalf of ISBN. During trial, Nicholas Bentivoglio testified that he received a HUD-1 settlement statement dated July 1, 2010 for the sale from the Meehans to Thomas Cappie for $1.6 million. (Doc. No. 157 at 94:22-25, Gov't Ex. 5-3.) When

Bentivoglio reviewed the settlement document, he discovered that the payout to the first mortgage holder was $841,000 and the payout to the second mortgage holder was $750,000. (Doc. No. 157 at 97:18-98:2.) This was puzzling to Bentivoglio and he testified,

> Given the value of the mortgage for the first lien was $1.2 million, that bank, in all of my years of experience, would not agree to take a short sale when - - on a contract of $1.6 million. Instead, they would have demanded the full value of the mortgage, $1.2 million, and then whatever was left over could then go toward the second lien payoff.

(Id. at 98:18-25.)

In addition, he received a copy of the same document with Michael Meehan's and Cappie's signatures, as well as an agreement of sale between Meehan and Cappie for $1.6 million dated June 21, 2010. (Id. at 99:22-100:2; Gov't Ex. 5-4.) In reality, the original sale price negotiated between Meehan and Cappie was only for $856,431 but as previously mentioned, Cappie was unable to secure financing to go forward with the purchase. (Doc. No. 157 at 19:12-20:2, 20:20-21:2.)

Bentivoglio received a second settlement document with Cappie as the seller and Kurz and ISBN as the borrower also dated July 1, 2010. (Gov't Ex. 5-7.) It indicated that the lender of this transaction was Stout Street. (Id.) Glenn also submitted an agreement of sale dated June 21, 2010 between Cappie as seller and Kurz and ISBN as the purchasers of the Waverly property for $1,850,000, containing their purported signatures and Glenn's notary attestation. (Gov't Ex. 5-5.) In reality, however, as noted in footnote 3 of this Opinion, Kurz was Glenn's secretary who assisted him with research and "typical clerical work." (Doc. No. 158 at 125:18-24.) She never was given authority to bind ISBN and she testified that she never signed documents on behalf of ISBN. (Id. at 130:4-17.) Moreover, Julio Pena of the Pennsylvania Department of State Division of Notaries testified that Glenn was never registered as a notary public. (Id.

104:19-24.)  During cross-examination, Bentivoglio pointedly described Glenn's control of the attempt to obtain the loan.  He testified:

> Sir, with all respect, the fact that you were presenting these documents to Oroton, you were, in effect, guaranteeing to us the entire nature of the transaction, and we were lending to the respective parties involved in the transaction based on the guarantees that were made to us by all parties involved, which included yourself.

(Id. at 154:9-15.)  Ultimately, Oroton did not go forward with the transaction.

## 2.  False Documents and Misrepresentations to Stout Street

Next, Terrence Dewyse of Stout Street testified to all the documents he received in connection with Glenn's loan.  (Gov't Exs. 6-1 to 6-30.)  First, Dewyse discussed the application dated June 23, 2010 filled out by Glenn on behalf of ISBN.  (Doc. No. 158 at 67:3-7, Gov't Ex. 6-3.)  The application disclosed Kurz and ISBN as the borrowers and sought a loan amount of $1,220,000.  (Id.)  It further indicated that the sale price of the Waverly property was $1,850,000. (Id.)

Second, Dewyse testified that he also received a signed agreement of sale dated June 3, 2010 with Michael Meehan as the seller and Kurz and ISBN as the buyer.  (Doc. No. 158 at 67:6-10, 69:12-20; Gov't Ex. 6-11.)   The purchase price was for $1,850,000.   (Gov't Ex. 6-11.) Meehan testified at trial that he had never entered into a separate agreement with Glenn, did not ever authorize anyone to sign documents in his name, and did not know who Kurz was or what ISBN was.  (Doc. No. 157 at 30:5-18, 42:2-8.)

Third, Dewyse testified that Glenn's representation that ISBN was an LLC was an important consideration for him to approve the loan.  (Doc. No. 158 at 71:7-18.)  To this end, he stated that Glenn had provided him with a copy of ISBN's certificate of formation, articles of organization, corporate resolution, and operating agreement as proof of its legitimate LLC corporate status.  (Id. at 72:13-25, 73:12-23, 75:1-23; Gov't Exs. 6-5-6-10.)  June Bilbrough of

the Delaware Division of Corporations, however, testified that ISBN did not exist in its database and that the certificate of formation was fraudulent. (Doc. No. 159 at 81:1-23.) Dewyse also had received a second purchase agreement, this one from Cappie to Glenn and ISBN, notarized by Glenn. (Id. at 77:1-78:1-12.) As stated above, Julio Pena testified that Glenn was never registered as a notary public. (Doc. No. 158 at 1-23.)

### 3. False Documents and Misrepresentations to National Capital

Richard Frankel of National Capital testified with respect to the $550,000 loan Glenn sought from his company during summer 2010. (Id. at 163:17-166:24.) He stated that Glenn submitted an agreement of sale dated August 5, 2010 showing Meehan as the seller and Glenn's other business, SSJ Realty, LLC as the buyer, with a purchase price of $855,000. (Id. at 171:3-25; Gov't Ex. 7-2.) Frankel also received a settlement statement dated August 27, 2010 showing the Meehans as the sellers and Glenn himself as the borrower with a purchase price of $855,000. (Doc. No. 158 at 186:3-16, Gov't Ex. 7-14.) As stated above, Meehan had testified that he never entered into a contract directly with Glenn and noted that the signature on this settlement document was a forged version of his signature. (Doc. No. 157 at 48:8-49:21.)

Glenn also had provided National Capital a form to indicate his assets and liabilities. (Id. at 170:8-171:1.) It stated he had zero liabilities. (Id. at 170:19-21; Gov't Ex. 7-1.) As discussed supra, Glenn's counsel provided an opinion letter which stated, in part, as follows:

> 1.      SSJ Realty, is an LLC, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has full power and authority to execute, deliver and comply with the Loan Documents and to carry on its business as it is now being conducted, and is qualified and in good standing in Pennsylvania and in each jurisdiction in which the character or location of the properties owned by it or the material business transacted by it requires such qualifications.

(Gov't Ex. 7-8.)  Chad Searer of the Pennsylvania Department of State Division of Corporations, however, testified that SSJ Realty was never licensed as an LLC.  (Doc. No. 158 at 171:18-172:17; 109:5-111:6.)

Shortly after the August 27, 2010 closing, Glenn directed Johnson to deposit an $80,000 check from the Mabstract escrow account into Shaheed's business bank account.  (Doc. No. 159 at 51:10-52:24; Gov't Ex. 11-2.)  Shaheed testified that he agreed to accept the deposit on Glenn's behalf and on August 30, 2017, the $80,000 was deposited into Shaheed's account. (Doc. No. 159 at 51:15-20, 52:23-24; Gov't Ex. 11-2 at 4.)  Glenn directed the distribution of these funds, including the payment of cash to himself.

## III.    ANALYSIS

### A. The Government Presented Sufficient Evidence for the Jury to Find Glenn Guilty Beyond a Reasonable Doubt on All Three Charges Set Forth in the Indictment

Based upon review of the evidence presented at trial and considering it in the light most favorable to the Government as the verdict winner, Glenn's Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(c) will be denied because the jury's verdict finding him guilty of conspiracy and two counts of bank fraud was supported by sufficient evidence.

Under Rule 29 of the Federal Rules of Criminal Procedure, a defendant may file a motion for judgment of acquittal based on insufficient evidence presented at trial.  Fed. R. Civ. P. 29(c). When considering a Rule 29 motion, a court must view the evidence and the reasonable inferences drawn in the light most favorable to the Government to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the evidence presented.  United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001).  In doing so, a court must make all reasonable references in favor of the jury's verdict.  United States v. Lore,

430 F.3d 190, 205 (3d. Cir. 2005); United States v. Salahuddin, 765 F.3d 329, 348 (3d Cir. 2014). Furthermore, a court may conclude that there was sufficient evidence to sustain a conviction, even if based on circumstantial evidence. United States v. Bortnick, Crim. A. 03-CR-0414, 2005 WL 1693924, at *4 (E.D. Pa. Jul. 20, 2005).

Therefore, it follows that a finding of insufficient evidence should only be made in situations where the Government clearly failed to prove its case beyond a reasonable doubt. United States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002) (citing United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)). Courts must take caution to avoid "usurp[ing] the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Brodie, 403F.3d 123, 133 (3d Cir. 2005) (citing United States v. Jannotti, 673 F.2d 578, 581 (3d Cir. 1982)).

1. **The Government Presented Sufficient Evidence to Show that Glenn Engaged in a Scheme to Defraud Two Mortgage Lending Companies as Alleged in Counts II and III**

Under 18 U.S.C. § 1344, it is unlawful for an individual to knowingly execute or attempt to execute a scheme (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises. § 1344(1)-(2). Accordingly, the Government was required to prove beyond a reasonable doubt that Glenn knowingly executed or attempted to execute a scheme to defraud or to obtain the money, funds or other property owned by, or under the control of, Stout Street and National Capital, as alleged in Counts II and III of the Indictment.

As described in extensive detail above, the Government introduced ample evidence showing Glenn's intention to defraud these mortgage lending companies by providing them with documents such as falsified agreements of sale, HUD-1 settlement documents, and false

corporate documents. The jury heard testimony regarding Glenn's statements and representations during meetings with lenders, including his attestations regarding his financial resources and status of the Waverly Property closing. (Doc. No. 157 at 49:4-51:19.) The Government called multiple witnesses who testified at length about Glenn's submission of false documents with forged signatures and settlement statements reflecting cash amounts that did not exist, all to create the appearance of legitimate financial transactions and status. (Id. at 46-51, 101-103, 216; Doc. No. 158 at 134-140.) As noted, the Court is not permitted to weigh credibility or to "substitute[e] its judgment for that of the jury." Brodie, 403 F.3d at 133. In view of the abundant testimony and evidence regarding Glenn's misrepresentations and fraudulent statements and documents presented to Stout Street and National Capital which were critical to their decision to make the loans, the jury had a reasonable basis for finding Glenn guilty of the two counts of bank fraud.

> **2. The Government Presented Sufficient Evidence to Show Glenn Engaged in the Conspiracy with Otis Johnson as Set Forth in Count I**

In addition to the two counts of bank fraud, Glenn also was charged in Count I with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349. In pertinent part, this statute provides:

> Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt, or conspiracy.

18 U.S.C. § 1349.

Accordingly, in this case, the Government was required to prove beyond a reasonable doubt that: (1) Glenn and Johnson agreed to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud either Oroton, Stout Street, or National Capital, which are mortgage lending businesses, by means of materially false and fraudulent pretenses,

15

representations, and promises, in violation of 18 U.S.C. § 1344; (2) Glenn was a party or member to that agreement; (3) Glenn joined the agreement or conspiracy knowing of its objective to defraud the three mortgage lending businesses and intending to join together with at least one other alleged conspirator to achieve that objective; and (4) at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

It is axiomatic that the existence of an agreement is a fundamental element in a conspiracy offense. United States v. Davis, 458 F. App'x 152, 160 (3d Cir. 2012); United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986). The agreement does not have to be formal or written; a general awareness of the scope and objective of the scheme by co-conspirators is adequate to demonstrate the existence of a conspiracy. United States v. Perez, 280 F.3d 318, 344 (3d Cir. 2002). In addition to proving the existence of an agreement that a defendant knowingly joined, the Government has the burden of proof to demonstrate that there was "(1) a shared unity of purpose [and] (2) an intent to achieve a common illegal goal." United States v. Boria, 592 F.3d 476, 481 (3d Cir. 2010) (citations omitted). Moreover, the Government does not have to prove that each defendant was privy to all "details, goals, or other participants in order to find a single conspiracy." United States v. Kelly, 892 F.2d 255, 259 (3d Cir. 1989).

During Glenn's trial, Otis Johnson, who was Glenn's co-conspirator, testified that he and Glenn agreed to seek loans in order to acquire property and misappropriate funds. He testified in part:

> Q: And you acted as title agent and escrow agent and settlement agent in the presumed sale of 818 Waverly in 2010, is that correct?
>
> A: Correct.
>
> Q: And in those sales John Glenn and/or his representatives and/or his companies represented themselves to be the purchasers of that property?

A:    Correct.

Q:    What was the - - what was the plan that you and Mr. Glenn had with respect to those presumed sales?

A:    To acquire the property and to steal money.

Q:    In these matters you were seeking loans from lenders, correct?

A:    Correct.

Q:    The first being Oroton?

A:    Yes.

Q:    The second being Stout Street Funding?

A:    Yes.

Q:    And the third being National Capital Management?

A:    Yes.

Q:    Was it your intention as the escrow agent to apply the funds provided by those lenders pursuant to the HUD-1s?

A:    No.

Q:    Was it your intention to misappropriate those funds?

A:    Yes.

Q:    Did you discuss the game plan with John Glenn in advance of these settlements?

A:    Yes.

Q:    What was the - - was there an agreement between you and Glenn about the disposition of the loan proceeds?

A:    Yes.

Q:    What was the agreement between you and John Glenn with regard to the disposition of the loan proceeds?

A:    To steal the money.

Q:    What was - - in this case there was an attempt to steal from Oroton, which was unsuccessful, correct?

A:        Correct.

Q:        What did you do with the funds that were deposited into your Mabstract escrow account from Stout Street Funding?

A:        They were distributed incorrectly, stolen.

Q:        What did you apply the funds to?

A:        Some past debt that Mabstract and myself had.

Q:        Was that what was agreed upon between you and Glenn, that is that you were going to use the funds to pay back your debt?

A:        No.

Q:        What were the funds supposed to be applied to?

A:        The funds were supposed to be applied to the payoff of 818 Waverly.

Q:        No, you said that you were not going to apply those funds.

A:        Oh, I'm sorry. I thought you meant the actual reason. I misunderstood. I apologize. The funds were supposed to go to Mr. Glenn.

Q:        For Mr. Glenn to do what?

A:        I'm not sure what he had planned to do with it, but to steal them.

Q:        Under those plans, what were you going to get out of it?

A:        Just the ability to bridge the money that I was owed to pay off debts that I had and new business.

Q:        Other real estate ventures?

A:        Exactly.

Q:        And did you understand Mr. Glenn to be intending to use those proceedings in real estate ventures of his own?

A:        Exactly.

(Doc. No. 158 at 205:21-208:16.)

Glenn alleges that Johnson had a separate scheme to "divert the funds for [Johnson's] business that is to pay off his debts of [Johnson's] company Mabstract, with no real intention of

splitting the proceeds with" Glenn.  (Doc. No. 151 at 3-4.)  Glenn claims that he "had no knowledge that Johnson diverted the funds in the escrow accounts." (Id. at 4.)  He argues that Johnson's testimony lacked legitimacy and credibility, emphasizing Johnson's status as a criminal defendant who admitted to cooperating with the Government in several cases, hoping for a reduced sentence.

The Third Circuit has held, however, that "uncorroborated accomplice testimony may constitutionally provide the exclusive basis for a criminal conviction." United States v. Perez 280 F.3d 318, 344 (3d Cir. 2002) (citing United States v. DeLarosa, 450 F.2d 1057 (3d Cir. 1971)).  Here, Johnson's testimony not only established Glenn's participation in the conspiracy with him but also, his testimony was corroborated by the testimony of other Government witnesses and a considerable amount of documentary evidence.  Moreover, if the defense seeks to question the credibility of an accomplice's testimony, the appropriate mechanism to do so is through cross-examination. Id. (quoting United States v. Enriquez, 2012 F.3d 1072, 1074 (8th Cir. 2000)).  The Third Circuit has acknowledged that:

> [w]hen a co-conspirator testifies he took part in the crime with which the defendant is charged, his credibility will automatically be implicated.  Questions will arise in the minds of the jurors whether the co-conspirator is being prosecuted, why he is testifying, and what he may be getting in return.  If jurors know the terms of the plea agreement, these questions will be set to rest and they will be able to evaluate the declarant's motives and credibility.

United States v. Jackson, 849 F.3d 540, 556 (3d Cir. 2017) (alteration in original) (citing United States v. Gaev, 24 F.3d 473, 477 (3d Cir. 1994)).

Glenn also argues that based upon Johnson's pretrial statement to the FBI when compared to his trial testimony, the Government knowingly presented or failed to correct false testimony at trial.  (Doc. No. 152 ¶ 21.)  In making this allegation, Glenn relies upon an FBI report in which Johnson apparently said that Glenn did not know of his plans to divert the funds

although Glenn had instructed him to keep the funds in the escrow account and that Johnson planned to do this even prior to meeting Glenn.  (Id. ¶ 19.)  The problem with Glenn's argument is that he cannot establish that Johnson lied while he was on the witness stand or lied during his 2012 interview with the FBI.  Glenn had the opportunity to cross-examine Johnson about his allegedly contradictory statement to the FBI agent and again Johnson's credibility was for the jury to decide.  By the verdict, the jury apparently believed Johnson and his testimony and other evidence was more than sufficient to establish Glenn's guilt on the offenses charged.

Thus, the jurors, who were instructed to weigh the credibility of each witness, were told to consider Johnson's testimony with "great care and caution."  (Doc. No. 161 at 75:18.)  They heard and observed Johnson's testimony about his role in the scheme, his own criminal background, and the plea agreement he made with the Government.  As such, the jurors evaluated Johnson's credibility while deliberating on Glenn's guilt or innocence.  In this case, viewing the evidence in the light most favorable to the Government, the evidence presented was sufficient to sustain the jury's finding that Glenn was guilty of conspiring with Johnson to commit the offense charged in Count I.

**B. Glenn Has Not Suffered a Due Process Violation by the Court Denying His Request for a Continuance of the Trial and by His Wearing Prison Garb During Trial**

Glenn also moves for a new trial pursuant to Federal Rule of Criminal Procedure 33. First, he claims that the Court erred in denying his request for a continuance before trial was set to commence.  (Doc. No. 151 at 2.)  He requested a continuance because he alleged that there was a delay in the transmittal of Criminal Justice Act (CJA) funds that impeded on his private investigator's and paralegal's ability to complete work on a motion for reconsideration to dismiss

the Indictment for pre-indictment delay.[6]  (Id. at 10; Doc. No. 152 at 4; Doc. No. 155 at 6-13; Doc. No. 156 at 5-6, 8, 12, 17.)

Second, Glenn argues for the first time in his new trial Motion that his private investigator was afforded neither the time nor the funds to interview the following individuals: (1) Angelo Stio, III, Esquire, an attorney who represented a party in a separate federal lawsuit against Johnson and his company Mabstract; (2) Dorian Mitchell, an alleged co-owner of Mabstract; (3) Edward Hayes, Esquire, an attorney who represented a party in a separate civil action against Johnson; and (4) Thomas Regan, Esquire, an attorney who represented another party in a separate federal lawsuit against Johnson and Mabstract.  (Doc. No. 170 at 14.)  Third, he alleges that he suffered a due process violation when he was required to go to trial on February 13, 2017 while wearing prison garb.  (Doc. No. 151 at 2.)

Under Federal Rule of Criminal Procedure 33, a court may grant a new trial "if the interests of justice so require."  Fed. R. Crim. P. 33(a); United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002).  Accordingly, the Court will address each of Glenn's arguments in turn to determine if a new trial is required by the interests of justice.

### 1.  Glenn Did Not Suffer a Due Process Violation when His Request for a Continuance of the February 13, 2017 Trial Date Was Denied

Many events resulted in the protracted path leading to Glenn's trial.  The Government has accurately summed up the procedural history of this case as follows after the returning of the Indictment on March 12, 2015:

> On May 15, 2015, Paul J. Hetznecker, Esq. entered his appearance on behalf of the defendant.

---

[6] In addition to his Motions for Judgment of Acquittal and a New Trial, Glenn also filed a Motion for Reconsideration of the Motion to Dismiss the Indictment (Doc. No. 217) and two Motions for Evidentiary Hearings (Doc. Nos. 218, 221).  These Motions are addressed in a separate Opinion issued on this day.

On May 19, 2015, this Court scheduled trial for August 5, 2015. DDE # 11.

On May 22, 2015, the defendant filed a Motion to Continue Trial Date, DDE # 18, and on June 9, 2015, this Court granted that motion. Trial was scheduled for October 26, 2015. DDE # 21, 22.

On October 21, 2015, defendant filed a second Motion to Continue Trial Date, DDE # 39, as did the government, DDE # 40. That same day, this Court granted the defendant's unopposed motion and scheduled trial for December 14, 2015. DDE # 41. At the defendant's request that the district court revisit the question of pretrial detention, the district court held a full evidentiary hearing on the issue on November 2, 2015. DDE # 81, pg. 4. The district court denied the defendant's request for bail. Id. at 44. On August 29, 2016, Glenn filed a pro se Motion for Pretrial Release, despite being represented at the same time by Susan Lin, Esq. DDE # 102. On September 30, 2016, the district court denied the defendant's motion for pretrial release. DDE # 107, 108. On October 3, Glenn filed a pro se interlocutory Notice of Appeal on the issue of pretrial release. DDE # 109.

On December 14, 2015, this matter came before the Court for trial. The government was fully prepared for trial, including having out-of-state witnesses on flights to Philadelphia that day. However, the defendant made an oral motion to continue the trial date, which the Court granted. DDE # 76, 77. In addition, the Court granted the defendant's oral motion to replace Hetznecker as defense counsel and appointed Vernon Chestnut, Esq. in his stead. DDE # 78, 79.

On January 5, 2016, the Court set a new trial date of June 15, 2016. DDE # 80.

On March 29, 2016, the Court granted the defendant's request for new counsel and, at the specific request of the defendant, appointed Susan Lin, Esq. DDE # 93.

On August 29, 2016, the defendant filed pro se motions requesting to proceed pro se and to be released on bail. DDE # 101, 102.

On September 23, 2016, Lin filed an unopposed Motion to Continue Trial Date. That same day, the Court scheduled a hearing on Lin's motion for September 30, 2016. DDE # 103, 105.

On September 30, 2016, the Court continued the hearing in connection with Lin's Motion to Continue Trial Date until October 11, 2016 in order to allow the defendant to consider his decision to request to proceed pro se. On October 21, 2016, the defendant, having been granted pro se status, moved to continue the October 24, 2016 trial date until February 13, 2017, which this Court granted. DDE # 115.

On February 10, 2017, Glenn, acting pro se, again requested an 11th-hour trial continuance, this time on the ground that he needed time to prepare and present a pre-trial motion on the issue of [p]re-indictment delay, and to prepare for trial as a pro se litigant. DDE #128. This continuance motion was denied and the case

proceeded to trial, resulting in a guilty verdict on February 23, 2017 as to all counts of the indictment. DDE # 140.

(Doc. No. 178 at 2-4.)

As a result of attorneys' entering their appearances and then withdrawing from the case and Glenn's decision to proceed pro se to replace Susan Lin, Esquire, who became standby counsel, the Court afforded Glenn continuances to ensure that he had sufficient time to prepare his defense. Three days before and the day trial was finally set to commence on February 13, 2017, Glenn asked for another continuance. (Doc. No. 128; Doc. No. 155 at 6-8:7.) This time he asserted that he needed more time because he wanted to prepare a motion to argue pre-indictment delay. Glenn claimed that because Lin allegedly failed to timely submit CJA vouchers to the Court, his investigator and paralegal were unable to receive funding to complete their work on the pre-indictment delay motion. (Doc. No. 152 ¶¶ 5-6; Doc. No. 155 at 6:17-7:23.)

This matter involving the pre-indictment delay motion was brought to the Court's attention in letters from Glenn, filed of record. (Doc. Nos. 125; 128.) During jury selection, but out of the presence of the jurors, Glenn informed the Court that he needed the services of his investigator, Kerry Tucker, a paralegal, Kevin Tamez, and a paralegal/legal analyst, Sarah Riley, to work on his motion for reconsideration of the Court's denial of his motion to dismiss due to pre-indictment delay. (Doc. No. 156 at 6:11-14.) The Court resolved this situation by permitting Glenn to file a motion for reconsideration on the issue of pre-indictment delay, if there was an adverse verdict. (Id.) This ruling afforded him all the time he needed to investigate this matter post-trial. In fact, Glenn did file a Motion for Reconsideration on the issue of pre-indictment delay (Doc. No. 217), which has been fully considered by the Court in a separate Opinion filed

the same day as this Opinion. The Motion was denied, and the Court dealt with all of Glenn's requests in his letters.[7]

In addition, Glenn now informs the Court for the first time in his Motion for a new trial that he sought to have the following witnesses interviewed by his investigator: (1) Angelo Stio, III, Esquire, an attorney who represented a party in a separate federal lawsuit against Johnson and his company Mabstract; (2) Dorian Mitchell, an alleged co-owner of Mabstract; (3) Edward Hayes, Esquire, an attorney who represented a party in a separate civil action against Johnson; and (4) Thomas Regan, Esquire, an attorney who represented another party in a separate federal lawsuit against Johnson and Mabstract. (Doc. No. 170 at 14.) Stio, Hayes, and Regan all allegedly represented parties who had previously sued Johnson. (Id.) Mitchell, Glenn claims, would have been able to testify about Johnson's company's debt and also about other settlements involving that company. (Id. at 15.) Glenn essentially avers that all these individuals would testify to Johnson's lack of credibility and trustworthiness.

Trial courts are granted broad discretion on whether to allow a continuance in a case. Morris v. Slappy, 461 U.S. 1, 12 (1983). When ruling on a motion for a continuance, the court must consider: (1) the efficient administration of criminal justice; (2) the accused's rights; and (3) the rights of other defendants whose trials may be delayed as a result of the continuance. United States v. Olfano, 503 F. 3d 240, 245 (3d Cir. 2007) (citing United States v. Fischbach & Moore, Inc., 750 F. 2d 1183 (3d Cir. 1984)). A denial of a request for a continuance can only be

---

[7] At the conference with Glenn during a break in jury selection, the Court permitted Glenn's investigator, Kerry Tucker, and paralegal/legal analyst, Sarah Riley, to continue to work on the matter of pre-indictment delay. Kevin Tamez, the other paralegal, had drafted a motion to dismiss due to pre-indictment delay and had completed his work. (Doc. No. 156 at 6:16-24, 20:21-23.) For this reason, there was no need to authorize him to continue to work on the motion and receive payment with CJA funds, especially since his work would have duplicated the work of the other paralegal, Riley.

found to violate due process if it was made arbitrarily, which depends on the circumstances of the case and the "reasons presented to the trial judge at the time the request is denied." Ungar v. Sarafite, 376 U.S. 575, 589 (1964). The Third Circuit has held that a "trial court's decision to deny a continuance will only be reversed on a showing of abuse of discretion." Paullet v. Howard, 634 F.2d 117, 119 (3d Cir. 1980).

Upon review of the considerable time of nearly two years allotted to Glenn to prepare for his defense, the Court denied his February 13, 2017 request for a trial continuance, noting as follows:

> We were here on the day of - - the day we were supposed to pick a jury. And at that time you said you wanted a new lawyer and Mr. Hetznecker to be relieved because you were unhappy with Mr. Hetznecker. He wasn't doing what you wanted him to do. So at that time I exercised my discretion and I continued the trial at your request and appointed new counsel, Mr. Chestnut. Mr. Chestnut did not work out and, again, I'm not saying you're responsible for that Mr. Glenn, but you requested that we appoint Ms. Lin. And I specifically granted your request and appointed Ms. Lin on March 31, 2016. And then, apparently, Ms. Lin had the conflict with the trial date we set eventually in October, and you insisted on a trial at that point and wanted to represent yourself.
>
> We made Ms. Lin backup counsel and you were proceeding pro se at that point. Obviously, we went through a long colloquy and I - - we had a trial date, as far as I can recall. And then you decided you needed more time and you wanted a continuance, and we gave you a firm trial date of today. And now within the last week, you've - - you're asking for another trial continuance on the eve of the trial and asserting you want to file this motion for pre-indictment delay. The Court can't just keep continuing the trial at the very last second, Mr. Glenn, because you've come up with another reason to continue the trial. I have afforded you every courtesy in terms of your requests, which have been quite numerous. The Court has filed - - had filed of record all the letters that you've sent to the Court over the last two years. You insisted on going to trial and you're going to have a trial today. I am - - I don't have any motion in front of me at this point. I just have a request for a continuance so you can file a motion. There are - - you know, no investigator has submitted a CJA form to get paid. I can only do so much in terms of granting a request for a continuance.

(Doc. No. 155 at 15:13-17:2.) Thus, in view of the length of time and amount of resources given to Glenn, the Court denied his request for a continuance. Appreciating Glenn's pro se status, the

Court also had approved numerous CJA vouchers in order for Glenn to investigate his defense, including vouchers for investigators and paralegals to assist him with analyzing the extensive number of documents in this case. Given the above sequence of events and actions taken therein, Glenn fails to show that the Court abused its discretion when it denied his request for a continuance.

Moreover, during the nearly two-year period Glenn had to prepare for trial, he had sufficient opportunity to have witnesses interviewed and to gather evidence for his trial. The first time Glenn had ever notified the Court of the need for Stio, Mitchell, Hayes, and Regan to be interviewed was in his memorandum filed June 19, 2017 in support of his Rule 29 and Rule 33 Motions. (Doc. No. 170.) Glenn asserts that the failure to interview these witnesses adversely affected his defense during trial. Though Glenn speculates otherwise, it is unknown whether the testimony of or information from any of these individuals that he wanted to be interviewed would have changed the outcome of his verdict, given the volume of evidence of his wrongdoing in this case. Glenn has not offered an explanation as to why he did not cause to be interviewed these individuals earlier than about two months before trial, either through his investigator, subpoena, or counsel. Moreover, with respect to the number of lawsuits Johnson faced, Glenn could have investigated these matters well before trial. Civil cases are typically matters of public record.

As noted above, Johnson, as a co-conspirator, was a critical witness against Glenn. Johnson had pled guilty pursuant to a plea agreement with the Government to charges in an Indictment (E.D. Pa. Criminal Action No. 13-554-01) and in an Information (E.D. Pa. Criminal Action No. 14-336-01). In the Indictment, he was charged with conspiracy to commit bank fraud and mortgage fraud affecting a financial institution and with the substantive offenses of bank

fraud and mortgage fraud affecting a financial institution. In the Information, he was charged with bank fraud. The Indictment related to offenses that in part involved Glenn. The Information involved conduct that did not relate to Glenn.

Before trial, Glenn had Johnson's plea agreement, the Indictment, the Information, a record of his prior convictions, and his prior testimony and Jenks material. At trial, he cross-examined Johnson about his plea agreement, his many false statements in a deposition and other documents, and his prior convictions. (Doc. No. 159 at 3-42.) His cross-examination covers nearly forty pages of trial transcript. Given Johnson's position as a co-conspirator and someone who testified against Glenn pursuant to a plea agreement, the Court instructed the jury, as noted earlier, to consider Johnson's testimony with "great care and caution." (Doc. No. 161 at 75:18.)

In view of all the events in this case as described above, it is apparent that a continuance would adversely affect the administration of criminal justice. Glenn was afforded numerous continuances, and the Court could not allow this situation to continue. If permitted to continue, it would have adversely affected the administration of criminal justice because all parties are entitled to a speedy trial. Moreover, the Government had numerous witnesses available, and on a prior occasion, the Court granted Glenn a continuance on the date of trial, which greatly inconvenienced these witnesses. The Court would not allow this inconvenience to occur a second time. Thus, the efficient administration of justice required that the case not be continued once again.

Second, in regard to Glenn's rights, he had ample opportunity to investigate this case, to interview and gather witnesses, and to formulate his attack on the credibility of Johnson. The evidence against Glenn was voluminous, and information about Johnson's civil cases would not have affected the jury's verdict.

Finally, this Court has a significant number of cases on its criminal docket, and delaying the Government's case would impact the handling of other criminal cases. For all these reasons, the interests of justice do not require that Glenn be afforded a new trial on the basis of the February 13, 2017 denial of a trial continuance.

### 2. Glenn Did Not Suffer a Due Process Violation Because He Was Not Compelled to Wear Prison Clothes During His Trial

In his Motion for Acquittal and/or Motion for a New Trial, Glenn argues that he was forced to wear prison clothes during his trial after the Court denied his oral Motion for a Continuance on February 13, 2017, violating his due process rights. (Doc. No. 170 at 18.) Ordering a defendant to appear before a jury in his prison clothes is a violation of that defendant's right to be presumed innocent until proven guilty. Gaito v. Brierley, 485 F.2d 86, 88 (3d Cir. 1973). However, a defendant "may not remain silent and willingly go to trial in prison garb and thereafter claim error." Id. at n.3. Moreover, a defendant's due process right to be presumed innocent until proven guilty is violated only if he is forced to appear before a jury in prison clothes. United States v. Laprade, No. 12-2432, 2013 WL 221456, at *4 (3d Cir. Jan. 22, 2013) (citing Gaito, 485 F.2d at 88 n.3).

In this case, Glenn had more than sufficient time to arrange for civilian clothing. Neither the Court nor the Government forced him to appear at trial in prison garb. When the Motion for a continuance was denied on February 13, 2017, Glenn proceeded to trial wearing the prison garb. He did not lodge an objection at that time. Although he claims that he "diligently pursued securing street clothing from the U.S. Marshals" (Doc. No. 152 at 5), no objection was made about wearing prison garb at trial. Accordingly, Glenn's argument that he suffered a due process violation because he was forced to appear in prison clothes before the jury lacks merit. A new trial will not be awarded for this reason.

## IV. CONCLUSION

For the foregoing reasons, Defendant John D. Glenn, Jr.'s Motion for Judgment of Acquittal or for a New Trial (Doc. No. 151) will be denied. An appropriate Order follows.